## STEWART v. CONNER.

1. The testimony of the clerk of a court that he had made diligent search for certain writs of execution, which belonged to the files of his office, and was unable to find them, is sufficient to let in secondary evidence of their contents.

2. Where the clerk of a court testifies that a book produced was the regular execution docket kept by him in his office, in which he made the entries of the issuing and return of certain executions; in respect to these entries the book may be received as evidence.

3. Where it is material to show that executions were in the sheriff's hands, it is admissible to prove that indorsements thereon acknowledging their receipt, are in the hand-writing of a sheriff who has since died.

4. If the plaintiff in execution receives of the purchaser of property at a sale, thereunder to be made, a bill payable at a future day, the plaintiff cannot object to an action *for money had and received*, brought by the defendant upon the reversal of the judgment, that he received in payment of his debt a bill, instead of the money.

5. Where one or two exececutors and guardians gives his several receipt for money which by agreement was paid to his companion, he is notwithstanding answerable to his *cestui que trust*, for although an executor or trustee may not be liable beyond the extent of the funds received by him, yet where there are several, and one gives a receipt for money not for conformity merely, and allows it to go into the hands of the other, he shall be chargeable as if he himself had received and appropriated it.

6. Where a decree of the Orphans' Court, upon the final settlement of the estate of a testator was reversed after it had been satisfied by the executor, the latter may recover back the amount paid. in an action for money had and received; unless the party in whose favor the decree was rendered, can show it was justly due. COLLIER, C. J., dissenting upon this point, was of opinion that the judgment of reversal vacated the decree *in toto*. that a Court of Chancery or the Orphans' Court, in virtue of the statute upon the subject, alone had jurisdiction of the matters of account involved in the settlement of the executorship; consequently the defendant could not litigate them at law, either as a plaintiff or by way of defence to the action.

7. Where an action for money had and received is brought by the defendant in a decree of the Orphans' Court, upon the settlement of an executor's account, which has been reversed, the statement of the account, made by a person appointed by the court previous to the decree, is not evidence *per se*—but it is competent to show, that the party against whom it is of-

fered assented to, or approved it, or he may support it by vouchers, or the testimony of witnesses.

8. An interest in the question does not disqualify a witness—it must appear that he will gain or lose by the direct legal operation and effect of the judgment, or that the record will be evidence either for or against him, in some other action.

9. Where the judgment will not be evidence for or against the witness, to show his exemption from, or liability to either party, or in any manner affect their rights in respect to the witness, he is competent to testify; and this although the judgment against the defendant would be evidence in his favor in an action at his instance against the witness to show that he had paid the money under legal coercion.

Writ of Error to the Circuit Court of Pickens.

This was an action of assumpsit, at the suit of the defendant in error. The declaration, among other counts, is, for goods sold and delivered ; money had and received ; money paid, laid out and expended ; money lent and advanced, and an account stated. The cause was tried on the plea of *non assumpsit*, a verdict returned for the plaintiff, and judgment rendered accordingly.

From a bill of exceptions, sealed at the instance of the defendant, it appears that the plaintiff offered as evidence a decree of the Orphan's Court of Pickens, rendered on the 1st July, 1841, on final settlement with Robert Jemison, Jr. and the plaintiff, Charles Stewart, as executors of the last will, &c. of Wm. Booker, deceased. The decree recites, that Aurelius N. Jones and William Conner, executors of the last will and testament of Sarah N. Booker, being present, the matters of the settlement were referred to Geo. B. Saunders, as auditor, and the accounts and vouchers examined by the court, whereupon, among other things, it appeared that there was in the hands of Jones and Conner, as executors as aforesaid, four thousand one hundred and one dollars, due to Jemison and Stewart as guardians of Edith M. Booker, an infant and legatee under the will of the testator. Thereupon it was adjudged that Jemison and Stewart, as guardians, &c. recov-

er of Jones and Conner, executors of the testatrix, the sum above mentioned.

The decree further recites, that Jones and Conner, as executors, are indebted to Jemison and Stewart in the sum of $720 37, for an allowance made by the Orphans' Court to compensate them for their services as executors as aforesaid. Thereupon a decree was rendered for that sum in favor of the latter against the former.

It is also affirmed by the decree, that Jones and Conner as executors, are indebted to Jemison and Stewart, as executors, in the sum of $1,614 77, for monies by them advanced of their own funds, in the management of the estate of the testator. Thereupon it was adjudged, that Jemison and Stewart, as executors, recover of Jones and Conner the last mentioned sum, and executions were ordered to issue for the collection of the several sums embraced by the decree.

The plaintiff then introduced a transcript of the record of the Supreme Court, from which it appears that the decree of the Orphans' Court, was reversed on error, in January, 1843. It was then proved on the part of the plaintiff, that three several *fi. fa's* were issued by the clerk of the Orphans' Court, for the collection of the several sums awarded by the decree in favor of Jemison and Stewart, for all which the clerk had made diligent search, but could not find them. *Further*, it was shown by the execution docket, that these *fi. fa's* were placed in the sheriff's hands, on the 8th July, 1841, and all levied on slaves, some of which were sold on the first Monday in September, 1841, and for the sale of others, a writ of *venditioni exponas* was issued. To the admission of this evidence the defendant objected, but his objection was overruled.

It was further shown, that two other writs of *fi. fa.* were issued on the decree—the one for more than four thousand dollars; the other for upwards of seven hundred; both of which were levied on slaves. To the admission of these *fi. fa's* and the *venditioni exponas* the defendant objected, but his objection was overruled. Plaintiff then proposed to prove the death and hand-writing of the sheriff, in whose hands these executions were placed, and then read his indorsements

thereon.   The defendant again objected, but the evidence was admitted.

The plaintiff then adduced the private docket.kept by the late sheriff, who was dead, and proposed to read therefrom a statement of the amount of the *fi. fa's*, their date, &c. together with a receipt for money received thereon, subscribed with the defendant's name.   He also proved that defendant's name was in his own hand-writing, and that J. B. Gladney, (whose receipts to the sheriff for the greater part of the money collected on the executions, were received by the defendant as cash,) became the recipient of the money under the following circumstances, viz: Jemison had authorized him to receive from the sheriff the amount specified in his receipts, and to apply the same to an individual debt of Jemison due the witness; which the defendant was in no way liable to pay, and did not unite in giving the order to the sheriff.   To accommodate one Terrell, who purchased Conner's property at the sale under the *fi. fa's*, Gladney received from him a bill of exchange for $3,600, and the residue of the $4,127 37 for which he receipted to the sheriff, was paid him by Randall Sherrod; Gladney applied the same to his demand against Jemison.

It was proved that the executions were satisfied from the proceeds of the plaintiff's property, or money raised by him, with the exception of some comparatively small sums: *Further*, that the defendant stated, a few weeks before the trial, that money was retained in Jemison's hands to pay the judgment in this case, if it were rendered against him; and that Edith M. Booker's guardians had declined a settlement with her husband until the result of this suit was known.

The defendant then adduced the wills of the testator and testatrix, Wm. and Sarah A. Booker, with a transcript of the probate of each, and letters testamentary thereon.   He also examined a witness, who stated that he was counsel for the plaintiff at a term of the Orphans' Court held in November, 1843, and his client was present under a citation to appear and settle the estate of the testatrix; that citation was dismissed, under a promise by the plaintiff that he would proceed with the settlement.   The reason assigned by the plaintiff for desiring delay, was, that he had made out an account and

delivered it to a predecessor of the then judge of the Orphans'
Court.   That account was produced and offered as evidence,
by the defendant; the plaintiff objected to its admission, and
his objection was sustained.   The defendant then proposed
to examine as a witness, Robert Jemison, a co-executor with
himself, of the testator, but he was excluded on the ground
of incompetency, at the plaintiff's instance.

He then offered a witness, who testified that the testator
died early in the year 1832, and that the testatrix died in
December, 1839, that plaintiff was the acting executor of the
latter, and witness one of the sureties in the administration
bond; and that assets to the amount of nine thousand dollars
came to the plaintiff's hands, which he voluntarily distribu-
ted among the legatees, including his wife, in January, 1840.
The defendant then proposed to prove by the same witness,
that in February, 1842, Richard Jones, one of the legatees,
refunded to the plaintiff about sixteen hundred dollars, (part
of his share of the estate,) to repay the plaintiff money paid
by him in satisfaction of the decree of the Orphans' Court in
favor of Jemison and the defendant: *Further*, that A. N.
Jones, another legatee, had indemnified the plaintiff to the
extent of the share of the estate which he had received.   To
the admission of all which the plaintiff objected, and his ob-
jection was sustained.   The witness testified that a negro
child, bequeathed by the testatrix to Edith M. Booker, was
pointed out by the plaintiff, and sold to satisfy the executions
from the Orphans' Court.

It was also proved, that Jones and the defendant were pre-
sent in their character of executors of the testatrix at the set-
tlement in July, 1841; that they examined the vouchers and
accounts presented by the defendant and Jemison against the
testatrix's estate, upon which the decree was rendered; and
although disappointed in the result, did not object to the cor-
rectness of the vouchers; and in conversations about the set-
tlement, up to November, 1843, the correctness of the ac-
counts were not questioned.

The defendant then introduced the judge and clerk of the
county court, who testified that the plaintiff and his co-exe-
cutor were present and attended to the settlement; and said
that they were disappointed in the result, but could not ob-

ject to it, and would take steps to pay it. Further, they understood from the parties that it was a voluntary settlement between them. A book was then presented by the clerk, in the hand-writing of G. B. Saunders, (who audited the accounts;) this book contained the accounts of the executors of testator, the guardians of Edith M. Booker, and against the estate of the testatrix, and was the only statement in his office of the accounts between the parties, which he had kept for his convenience. The defendant then offered to read from that book the balance therein stated to be due from the plaintiff and his co-executor, to the defendant and Jemison, which corresponded with the sum adjudged by the decree; to the reading of this the plaintiff objected, and his objection was sustained.

Thereupon the court instructed the jury substantially as follows: 1. To authorize them to find a verdict for the plaintiff, they should be convinced from the evidence, that the executions founded on the reversed decrees of the Orphans' Court were satisfied with his property, or money.

2. That notwithstanding the estate of the testatrix may have been, or may still be, indebted to the estate of the testator, that indebtedness would not bar a recovery by the plaintiff, for a legal demand, due him individually against the defendant, in his individual capacity.

3. If the money was made on the executions out of the plaintiff's property, the arrangement by which the defendant alone, or in connection with Jemison, received Gladney's receipt from the sheriff, as money, would not affect the plaintiff's right to recover, any more than if the defendant had purchased the plaintiff's negroes at the sheriff's sale.

4. If they believed that the negro girl Mary, who was sold by the sheriff, was the property of Edith M. Booker, the sum for which she sold could not be recovered by the plaintiff; nor was the defendant liable for the watch and the ninety-seven dollars, in respect to which there was evidence. In other words, the plaintiff was only entitled to recover so much as he was coerced to pay on the executions.

The defendant's counsel then prayed the court to charge the jury as follows: 1. If the executors of the testatrix and and testator respectively, went into a voluntary and mutual

settlement, at the time the decree of July, 1841, was render-
ed, and the jury should believe that the accounts were cor-
rect, and the balance allowed was due, then the settlement is
conclusive evidence of the indebtedness of the plaintiff and
his co-executor to the defendant and his co-executor, notwith-
standing the decree has been reversed.

2. If the jury believed from the evidence, that the defend-
ant received the money sought to be recovered, in his repre-
sentative character, under executions against the plaintiff in
his representative character, then the plaintiff could not re-
cover.

3. If the jury believed from the evidence, that the plaintiff
and his co-executor, were indebted to the defendant and his
co-executor, for the amounts set forth in the decretal order of
July, 1841, that then the plaintiff could not recover.

4. If the jury believed from the evidence, that assets of
the testatrix's estate came to the hands of the plaintiff, as ex-
ecutor, to the amount of the sums paid by him on the execu-
tions, and that he distributed these assets, and admitted
the sums mentioned in the decree of July, 1841, to be due
from the estate of the testatrix to the estate of the testator,
then the plaintiff could not recover.

5. If the jury believed from the evidence, that the amount
specified in Gladney's receipts, were received by Gladney,
by Jemison's order, and applied to the individual accounts of
the latter, with which the defendant had no connection, then
the plaintiff could not recover these sums in this action.

6. That from all the testimony in the cause, the plaintiff
was not entitled to recover. All of which several charges
the court refused to give.

W. COCHRAN, P. MARTIN, and B. W. HUNTINGTON, for plain-
tiff in error, made the following points: 1. Jemison was a
competent witness for the defendant below, and should have
been allowed to testify. It cannot be assumed that he would
either gain or lose by the result of this suit; but his interest,
if any, is remote and contingent. [Massey v. Rogan, 6 Ala.
Rep. 647.] Stewart was sued alone, in his individual capac-
ity, and if cast in the action, could not call upon Jemison to

Stewart v. Conner.

contribute, but for his indemnification should retain the assets. In Wiggin's Adm'rs v. Pryor, 3 Porter's Rep. 430, the competency of an administrator, not a party to the record, to give evidence in favor of the estate he represents, is clearly maintained. 2. The decree of the Orphans' Court has been reversed, yet if the amount collected under it was really due to the executors of the testator, they cannot be compelled to refund it. [Duncan v. Ware's Ex'rs, 5 Stew. & P. Rep. 119 ; Owing v. Owing, 10 Gill & Johns. Rep. 267.] If Conner was reimbursed by any of the distributees, or legatees, for money paid under the decree, the defendant should in his defence have been allowed to prove that such reimbursement was made. Consequently, the testimony of Sherrod to that point should have been admitted. 3. The account of the plaintiff with the Orphans' Court was also competent ; it was preliminary to the fact of reimbursement, as it would have been first shown that he had disbursed the assets. Such proof was necessary to show why the money was made out of Conner's individual estate, viz : that he was guilty of a *devastavit.* 4. The book of the individual who acted as auditor in adjusting the account in the Orphans' Court, was *quasi* a record, and should have been allowed to go before the jury as evidence. [Hartly & Co. v. Chandler, et al. 6 Ala. Rep, 857.] 5. The defendant was not chargeable with the amount of Gladney's receipts, for he did not, nor could have expected to receive a benefit from them. In assenting that the executions should be thus satisfied, he acted as the agent of the estate he represented, and merely recognized the validity of the payment made to his co-executor. Here the defendant did not, (as it respects these receipts,) receive money, or its equivalent, which in the present form of action is necessary to charge him. 6. The variance between the decree and executions will be apparent on inspection.

E. W. PECK, for the defendant in error, insisted—1. That as the money sought to be recovered was made out of the individual property of the plaintiff, the action was well brought and could not have been sustained in the name of himself and co-executor. And Stewart was the only party liable ; for upon the reversal of the judgment he held the money for

the use of the party from whom it was collected. See Burdine v. Roper, 7 Ala. 466.

2. Jemison was an incompetent witness for his co-executor, because the two sums, $720 37 and $1614 77, when collected, belonged both to Jemison and Stewart, and they may have divided it between themselves. If Jemison had received his share, he would, if Conner succeeded, be bound to refund, and if he had not received it, he would be entitled to it, if the plaintiff failed in the action ; so that in either event he was interested. See 1 Phil. Ev. C. & H.'s Notes, 55 to 63 ; 3 Johns. Cases, 82 ; 14 Johns. Rep. 81 ; 4 Johns. Rep. 292.

3. Property paid or received as money, will support the action for money had and received. [7 Cow. Rep. 662.] So if a promissory note is taken in satisfaction of a judgment, which is afterwards reversed, an action for money had and received will lie. [6 Cow. Rep. 297.] Conner's property was sold. Stewart gave his receipt as for money, and the plaintiff being a stranger to the arrangement between the sheriff, Terrell, Gladney, Stewart and Jemison, cannot be prejudiced, but must recover as if the defendant had received the money, instead of Gladney's receipt. The defendant consented, that the money made of the plaintiff's property should be applied by Gladney to the payment of Jemison's debts, and he is liable in the same manner as if he had received and retained it in his own hands.

4. As to the argument that Jones and Conner admitted their liability as executors, these admissions were made under a misapprehension, and would not bind them elsewhere than in the Orphans' Court ; but they might show the incorrectness of Jemison and Stewart's accounts. It must also be remembered, that Conner is now suing in his own right, and what transpired in the Orphans' Court is no evidence against him here—of the settlement of the executor's accounts of the respective estates, the Circuit Court has no jurisdiction.

COLLIER, C. J.—The evidence of the clerk of the county court, that he had made diligent search for the three writs of *fieri facias*, which first issued for the collection of the several sums adjudged by the decree to Jemison and Stewart,

and had been unable to find them, we think was quite suffi-
cient to let in secondary evidence of their contents.

By the act of 1812, the clerk of every court is required to
enter in a docket, or book kept for that purpose, a list of all
executions issued by him, specifying therein the names of the
parties, the amount of the judgment, interest and costs in
such execution; the name of the person to whom it was de-
livered, to what county directed, the date when isssued, and
the return day thereof; and when the same is returned, shall
without delay, record it at large on the same page or folio on
which the execution is entered, and shall constantly carry
the book to the court of which he is clerk.    [Clay's Dig. 144,
§ 8.]    In Hartley, use, &c. v. Chandler, et al. 6 Ala. Rep.
857, we said, " whether the entries upon the execution dock-
et are evidence *per se*, we need not inquire; but when aided
by the testimony of the clerk, or his deputy, that they were
genuine, and that he had no doubt but they correctly stated
the day when executions were returned, we know of no prin-
ciple of law which would render them incompetent evi-
dence."    The clerk in the present case, made a statement
conforming substantially to what was there held to be suffi-
cient, viz : that the book produced was " the regular execu-
tion docket kept by him in his office, in which he made the
entries of the issuance and return of executions."    There was
then no error in the admission of the execution docket.

We are unable to discover any objection to the proof show-
ing that other executions subsequently issued upon the de-
cree, that the sheriff in whose hands they were placed was
dead, and that the indorsements thereon were in his hand-
writing ; and consequently cannot say that this evidence was
improperly admitted.

All the receipts for money collected by the sheriff under
executions issued upon the decree of the Orphans' Court are
subscribed by the defendant, some of them in his individual
capacity, and the others describe him as guardian, or one of
the guardians of E. M. Booker.    The receipt for Gladney's
receipts is in these words ; " Rec'd of John F. Nabors, J. B.
Gladney's rec'pts for four thousand and eight dollars and
thirty-four cents, and thirty-nine 37-100 dollars, in cash,

which is in full satisfaction of the balance due on the two above stated executions.     CHARLES STEWART,  .

*Guardian of E. M. Booker.*"

The sum expressed in Gladney's receipts was never paid over to the defendant, *in cash*, but by an arrangement between Jemison, his co-executor, and Gladney, a private debt due by Jemison to the latter, was settled by the purchasers of the plaintiff's property, at the sheriff's sale, paying that amount to Gladney. In respect to this receipt and money not paid to the defendant, it is contended, that there should have.been no recovery.

In Ainslie v. Wilson, 7 Cow. Rep. 662, one of the questions raised was, whether the payment of a debt, (dischargeable in money,) as surety or indorser, 'by conveying land, which is received at the time as payment, will support a count for money paid, laid out and expended. The judge who delivered the opinion of the court said, "I have no doubt that as the conveyance of land was received in discharge of a money debt, due from the plaintiff, it is, in judgment of law, to be considered the same.thing as if the plaintiff had actually paid the money. The Murrays received it as money, or as an equivalent for money. They had the right of electing. To the defendant it was immaterial whether the money was made in one way or the other. If an agent receives property for his principal, and there is no presumption that it has been converte into money, the action for money had and received will not lie; but if the agent appointed to collect a money debt, should accept from the debtor in extinguishment, property as money, he would not be permitted to question this form of action." See also Clark v. Pinney, 6 Cow. Rep. 297.

In the action for money had and received, it is generally necessary to show the receipt of money; but if the parties have treated the consideration upon which the plaintiff seeks to rest the liability, as money, or a sufficient time has elapsed, so as to raise an inference that it has been converted into money, then it is said the action may be supported. In Hinkley v. Fowler, 15 Maine R. 285, it was held, that where one sells property belonging to himself and others, and takes promissory notes therefor to himself alone, payable on time,

and transfers the notes for his own benefit, an action will immediately lie for money had and received. So in Pickard v. Banks, 13 East's Rep. 20, a stockholder who had received country bank notes as money, and paid them wrongfully to the original staker, after he had lost the wager, was adjudged to be answerable to the winner, in an action for money had and received. Lord Ellenborough remarked, " Provincial notes are certainly not money ; but if the defendant received them as ten guineas in money, and all parties agreed to treat them as such at the time, he shall not now turn round and say that they were only paper and not money." Best, C. J. said, " the principle in all cases is, that if a thing be received as money, it may be treated and recovered as such." 'See also, Tinslar v. May, 8 Wend. Rep. 561 ; Morrison v. Berkey, 7 Sergt. & R. Rep. 246 ; Fairbank v. Blackington, 9 Pick. Rep. 93.

We have already intimated that this action may be supported where property has been received, if it can be readily converted into money, and the defendant's conduct affords a presumption that he has so converted it. [Hunter v. Welch, 1 Starkie's Rep. 224 ; Whitewell v. Bennett, 3 B. & P. Rep. 559 ; Levy v. Goodson, 4 T. Rep. 687 ; Longchamp v. Kenny, Doug. Rep. 137 ; Andrew v. Robinson, 3 Camp. Rep. 199.]

In the case at bar there is no reason to doubt, that the amount for which Gladney gave his receipt was not paid in cash, previous to the institution of this action. In fact it is shown that a part of it was paid in cash at the time, and for the residue he accepted a bill of exchange, which matured before the decree of the Orphans' Court was reversed. Whether this bill was ever paid or not, is an inquiry immaterial to the plaintiff, for his property was sold by the sheriff, for cash, and the bill was received by the defendant and Jemson as a substitute for the money.

In Edmonds, et al. v. Crenshaw, 14 Peters' Rep. 166, it was said that " one executor having received funds cannot exonerate himself and shift the trust to his co-executor, by paying over to him the sums received. Each executor has the right to receive the debts due to the estate, and discharge the debtors , but this rule does not apply as between the ex-

ecutors.   They stand upon equal ground, having equal rights, and the same responsibilities.   They are not liable to each other, but each is liable to the *cestuis que trust*, to the full extent of the funds he receives."   See also, Crosse v. Smith, 7 East's Rep. 246 ; 2 Sch. & Lef. Rep. 231 ; 1 Russ. & M. Rep. 231 ; 1 Younge & J. Rep. 409; 6 Watts' Rep. 185, 250 ; 11 Johns. Rep. 16 ; 1 Blackf. Rep. 301 ; 3 Bibb's R. 97.

The Lord Chancellor remarked, in Sadler v. Hobbs, 2 2 Brown's Ch. Rep. 114, " I take it to be clear, that when, by any act, or any agreement of the party, money gets into the hands of his companion, whether a co-trustee or a co-executor, they shall both be answerable.   And such we understand to be the doctrine in equity.   [See also, 1 Dall. R. 311; 2 Penn. Rep. 419; 1 Turn. & R. Rep. 360; 5 Johns. Ch. Rep. 283 ; Ram. on Ass. 542, 544, 547 ; 1 P. Wms. R. 83 ; 7 Ves. Rep. 186 ; 9 Id. 103 ; 11 Id. 254, 319, 333 ; 3 Sim. Rep. 265.]   But it has been held, that an executor in trust is not answerable in equity for the receipt of his co-executor, when the former has merely taken probate, permitted the other to possess the assetts, and joined in acts necessary to enable that co-executor to administer.   [4 Ves. R. 196, 608.]   So where a testator by his will appointed three executors, and empowered one of them to sell the moiety of a freehold estate, which the testator held in common with that executor, and declared that the money arising from such sale should be applied and. disposed of in the same manner as his personal estate.   The three executors proved the will, and the executor on whom the power of sale was conferred employed one of his co-executors to sell the land, who accordingly sold it, and paid over the money to the former. *Held*, that the executor who acted as an agent in selling, had no legal right to retain the price of the testator's moiety, and was not liable, though it was misapplied by his co-executor, to whom he had paid it.   [1 Russ. & M. Rep. 64 ; see also, Ram. on Ass. 524; 11 Ves. Rep. 335.]

Although trust money is paid to one trustee where there are several, yet it is in many cases necessary that the receipt for it be signed by all of them.   [2 Atk. Rep. 584 ; 1 P. Wms. 83.]   And where trustees in such case join in a receipt,

it is competent for any one of them to show, that he received no part of the money, but it was paid to his co-executor, and he joined merely for conformity. [7 Ves. Rep. 198; 11 Id. 324.] But the weight of authority tends to prove, that this rule does not hold to the full extent in favor of executors. What was said by the *Lord Keeper*, *arguendo*, in Westley v. Clarke, 1 Eden's Rep. 356, goes to deny the distinction, and considers executors as standing in the predicament of ordinary trustees. [See also, 1 P. Wms. Rep. 241; 4 Ves. Rep. 596; 1 Eden's Rep. 145.] But *Lord Elden*, has repeatedly expressed his disapprobation of the relaxation in favor of executors of the rule which distinguishes between their receipts and those of other trustees. [5 Ves. Rep. 331; 7 Id. 197; 11 Id. 323, 333; 16 Id. 477.] In Brice v. Stokes, 11 Ves. 324, he said, " At law, where trustees join in a receipt, *prima facie* all are to be considered as having received the money. But it is competent to a trustee, and if he means to exonerate himself from that inference, to show that the money acknowledged to have been received by all, was in fact received by one; and the other joined only for conformity. In the case of executors it has been said, and well said, to be otherwise. An executor, as it is not necessary for him to join, interfering in the transaction unnecessarily, the inference is just the other way; he is to be considered as assuming a power over the fund; and therefore answerable for the application, as far it is connected with the particular transaction in which he joins. Upon considering the cases paring down that rule of late, I repeat what I have said upon a former occasion, that it is safer for executors to abide by a general rule of that sort, than to lay down a rule trying the application of it by looking to particular circumstances, in particular cases; which will raise very different inferences in different minds."

In Joy v. Campbell, 1 Sch. & Lef. Rep. 341, Lord Redesdale said, " the distinction appears to be this, with respect to a mere signing, that if a receipt be given for the mere purposes of form, then the signing will not charge the person not receiving; but if it be given under circumstances purporting that the money, though not actually received by both executors, was under the control of both, such a receipt shall charge, and the true question in all those cases seems to have

Stewart v. Conner.

been, whether the money was under the control of both executors; if it was so considered by the person paying the money, then the joining in the receipt by the executor who did not actually receive it, amounted to a direction to pay his co-executor; for it could have no other meaning; he became responsible for the application of the money, just as if he had received it. But this does not apply to what is done in the discharge of a necessary duty of the executor." And as an example, it was added that an executor residing at one place, may remit funds to his co-executor, living at another, to pay debts there owing, without incurring a liability for its misapplication. "He must remit to somebody, and he cannot be wrong if he remits to the person in whom the testator himself reposed confidence." See also, 3 Browne's Ch. Rep. 90; Lewin on Trusts, &c. 271, 279; 1 Salk. R. 318; 3 Swans. 64; 2 Sch. & Lef. Rep. 239, 245. In Monell v. Monell, 5 Johns. Ch. Rep. 283, *Chancellor Kent* reviews several of the leading cases we have cited upon this point, and says, "it may be laid down as a principle, that if two guardians, or other trustees, join in a receipt for moneys, it is *prima facie*, though not absolutely conclusive, evidence that the money came to the hands of both; that one trustee may show by satisfactory proof, that the joining in the receipt was necessary, or merely formal, and that the moneys in fact were paid to his companion; that without such satisfactory proof, he must be liable to his *cestui que trust*, and that if the moneys were in fact paid to his companion, yet if they were so paid by his act, direction, or agreement, when he had it in his power to have controlled or secured the money, he is, and ought to be responsible." [See also, 7 Johns. Ch. Rep. 22; 4 Sim. Rep. 28; 2 Story's Eq. 520 to 524; 8 Price's Rep. 127; 11 Sergt. & R. Rep. 66.]

If Jemison was not authorized to receive the money that might be collected under the decree of the Orphans' Court, the assent of the defendant that it might be appropriated by him to the payment of his individual debt to Gladney, would in point of law, be the same thing as if it had been first paid to the defendant, and by him handed over to Jemison. But assuming as we must, from the form of the decree, that they

103

were both equally entitled to receive the money, and we think the legal inference is irresistible, that it was appropriated by Jemison by the defendant's consent.   If it was not a matter of previous arrangement between them, the defendant certainly approved and sanctioned the agency of his co-executor, and co-guardian in the business.   And this must be the conclusion upon the facts, whether, where there are several guardians, each possesses power within the sphere of their duties, to perform the trust devolved upon all, in the same manner that executors do, or whether they are to be treated merely as trustees.   It results from this view, that the defendant's receipt is sufficient to charge him in this action, unless he shows a right to retain the money.

In Roebuck v. Dupuy, 7 Ala. Rep. 484, it was held, that an action for money had and received, will lie to recover back money paid upon a judgment which has been since reversed, unless the retention of the money by the defendant, is consistent with equity and good conscience.   But the equitable right to retain, must grow out of, or be connected with, the case in which the judgment is vacated ; if the defendant has another cause of action, in which he will be entitled to recover as much as he retains, he must become the actor in a suit, and have his damages ascertained by a judgment ; unless such independent cause of action would be available as a set off.   We there cited with approbation, Green v. Stone, 1 H. & Johns. Rep. 405, in which it was said, that "a judgment reversed becomes mere waste paper, and the rights of the party, immediately on the reversal, are restored to the same situation in which they were prior to the pronouncing of the judgment so reversed."

My brethren are of opinion that it is competent for the defendant to resist a recovery, by showing, that notwithstanding the reversal of the decree of the Orphans' Court, the amounts which it adjudged to Jemison and himself, were justly due them from the plaintiff and his co-executor.   But I am inclined to think, that upon the reversal of the decree, the entire settlement made by the Orphans' Court was vacated, and of no effect; that that court, or a court of Chancery, was only competent to adjust the matters of account anew ; consequently the Circuit Court could not investigate them, and deter-

Stewart v. Conner.

mine that the decree was rendered for the proper amount, so as to give to the defendant the right to retain the money collected thereon. [See Gause and wife v. Hughes, 9 Porter, 552; Leavens v. Butler and wife, 8 Ib. 380.] In stating, in general terms, as it is usually laid down, that the defendant may resort to any equitable or conscientious defence to resist the recovery of money paid him on a judgment which has been since reversed, I cannot think that it is competent to set up as a defence, matters exclusively cognizable in equity, or other court of a peculiar and extraordinary jurisdiction. It is laid down in all the elementary books, that the action of *indebitatus assumpsit* is in its nature " equitable ;" that when a party has received money which *ex æquo et bono* he ought not to retain, it may be recovered by the person entitled to it, in an action for money had and received. Yet I imagine it would not be pretended that the plaintiff could be permitted to recover in any form of action upon a cause purely of equitable cognizance ; nor can I perceive how a defence of that character could be made available at law.

According to the view taken by my brethren, of the law upon the point just noticed, the account stated by Saunders, the auditor appointed by the Orphans' Court, would not in itself be evidence, unless it was in some manner assented to, or approved by them; but so far as it is supported by the testimony of witnesses, or duly established vouchers, it might be laid before the jury. The exception to its admission is not sufficiently precise and explicit to enable us to affirm that the Circuit Court erred in that respect.

It is contended for the plaintiff in error, that Jemison was a competent witness for him, and should have been permitted to give evidence to the jury. In Massey v. Rogan, 6 Ala. Rep. 647, we said, to make a witness incompetent upon the ground of interest, it must be shown that he will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be evidence, either for or against him, in some other action. It must be a present, certain, and vested interest, and not uncertain, remote or contingent.

To disqualify a witness for the reason that the verdict will be evidence against him, it is not enough, that it is admissible against a third person, a recovery against whom would

be evidence against the witness.   Thus in an action against a sheriff for a false return of *nulla bona*, the servant of the deputy, who had charge of certain goods levied on, but who let them go, was held competent for the sheriff, though he would not be in an action by the sheriff over against the deputy ; and though the record in the action then pending would be evidence against the deputy, and thus over against the servant.   [1 Carr. & P. Rep. 156.]   So if the witness be interested as vendor, the verdict must be evidence against him as immediate vendor ; not first against another person, who may recover over against the witness as a remote vendor.   [1 M. & Payne's Rep. 653 ; 2 N. & McC. Rep. 153 ; 2 Phll. Ev. C. & H.'s Notes, 81, *et post*.]

In an action against a sheriff for the default of his deputy, the question was whether the execution had been delivered to the sheriff in due season; the plaintiff offered the attorney who issued the execution to prove the delivery.   The defendant objected, that the attorney must answer to the plaintiff for his negligence if the execution was not delivered in due time ; but the court held that his interest was too contingent and remote.   [11 Mass. Rep. 242 ; see also, 12 Mass. R. 20.]   In a suit against an agent to recover back money paid him, on the ground that nothing was due to the principal, the latter is a competent witness for the defendant, who alledged a payment to the principal without notice.   [10 Serg. & R. Rep. 442.]   One co-heir and tenant in common, is a witness for or against another, in ejectment.   [7 Serg. & R. Rep. 192.]   A witness is not incompetent for the plaintiff in ejectment, merely because he claims other land depending on the same location and boundary, which the plaintiff is seeking to establish.   [1 Bibb's Rep. 105 ; 2 H. & Mc. H. Rep. 473 ; 2 Rand. Rep. 87 ; 1 Dana's Rep. 179.]

In a motion against a constable and his sureties for failing to return a *fieri facias*, an obligor in the bond was held to be a competent witness to prove that the bond had not been acknowledged before a constable, and therefore not a statute bond, which had the force and effect of a judgment.   The court thought the witness had no interest in the event of the suit, and no testimony which he could give would impair his liability on the bond.   [2 Dana's Rep. 97.]   So in an ac-

tion on a book account, the defendant introduced a witness who testified, that upon the sale of a horse, by the witness to the plaintiff, it was agreed between them that a portion of the price should be applied in part payment of this account, and that the defendant should pay the amount of such portion to the witness ; and that the defendant did pay this amount to the witness, in pursuance of the agreement. *Held*, that if the plaintiff recovered, the verdict could not be given in evidence, in an action against the witness, in favor of the defendant. The verdict would not show whether the witness had accounted with the plaintiff for the money received by him or not, but would be *res inter alios acta*, and the witness consequently competent to give evidence. [16 Pick. R. 560.] In trespass, *quare clausum fregit* against a mortgagor, the mortgagee was held competent for the defendant on a plea of *liberum tenementum*, on the ground doubtless, that the verdict could not affect the witness. [5 Tyrw. R. 143 ; see also, 2 Fairf. Rep. 341, 377.] A joint debtor not sued, it is said, is a competent witness for the plaintiff, unless he is called to prove the joint liability ; and it has been held, that he is a competent witness for the defendant, but the decisions upon the latter point are by no means uniform. [2 Phil. Ev. O. & H. Notes, 82, 110, 112, 113, 118, 133 ; 2 Id. 1520 to 1522.]

The liabily of a witness to a like action, or standing in the same predicament with the party who calls him, if the verdict cannot be given in evidence for or against him, is an interest in the question only, and does not exclude him. Thus it has been held that one underwriter may be a witness for another underwriter upon the same policy, [3 T. Rep. 27] ; or one seaman for another, whose claim for wages is resisted on grounds equally affecting all the crew ; [1 Mason's Rep. 104 ; 3 Johns. Rep. 518 ;] or one freeholder for another claiming land under the same title, or by the same lines and corners ; [2 Rand. Rep. 87 ; 5 Wheat. Rep. 423 ;] or one devisee for another claiming under the same will ; [6 Cow. R. 248 ;] or one trespasser for his co-trespasser ; [1 T. Rep. 301; 5 B. & C. Rep. 387 ; 3 C. & P. Rep. 172 ; 12 Martin's Rep. 289 ;] or a creditor for his debtor ; [6 Esp. Rep. 34 ; 5 B. & Ad. Rep. 439 ;] or a tenant by the curtesy, or tenant in dow-

er, for the heir at law, in a suit concerning the title ; [8 Wen. Rep. 426 ; 1 B. & A. Rep. 439 ; Greenl. Ev. 434-8-9, 440-1-7-9.]

It is said that if a witness erroneously thinks that he is interested, he may be informed by the court that he is not, and required to give evidence. [Greenl. Ev. 433.] And mere prejudice, though he states it, and asks to be excused from testifying, will not authorize the exclusion of a witness. (6 Watts' Rep. 507.)

In the case at bar, perhaps a judgment against the defendant might be given in evidence in an action by the latter against Jemison, to show that he had paid the money under legal coercion, yet it would not establish the justness of the recovery, or its amount. In many of the cases cited the right of action against the witness was consequential to the recovery against the party for whom he was called to testify, and to show *that fact*, the judgment would be admissible in the suit which might be subsequently brought against the witness. But in these as in the case before us, the judgment concluded no question either for or against the witness. A recovery against the defendant does not necessarily give him a right of action against Jemison, and will not relieve the defendant in a suit against Jemison, from making out his case by proof *aliunde*.

It cannot be assumed that Jemison would be liable to the defendant should the plaintiff succeed in this action. For any thing appearing to the contrary, the defendant and Jemison may have adjusted the matter between themselves, so that the latter would in no event be liable to the former. But if the plaintiff should fail to recover, could he not still proceed against Jemison notwithstanding the verdict and judgment in favor of the defendant, without being prejudiced in such action by that judgment ? If this be so, it is too much to assume as a legal conclusion, that Jemison was interested for the plaintiff's success. In every view, we think that the interest of Jemison, so far as shown by the record before us, was in the question merely, and therefore it cannot be said he was disqualified from testifying for the defendant. The other questions raised upon the record, are either em-

braced by those considered, or will not, if what has been said, is observed, arise upon a future trial.

We have but to add, that the judgment of the Circuit Court is reversed, and the cause remanded.

GOLDTHWAITE, J.—In my judgment, the witness, Jemison, was incompetent to testify, under the circumstances, in evidence. In other respects, I concur in the opinion expressed.