# WILLIAMS *vs.* PEARSON,

<table>
<tr><td>38</td><td>299</td></tr>
<tr><td>104</td><td>230</td></tr>
<tr><td>38</td><td>299</td></tr>
<tr><td>131</td><td>239</td></tr>
<tr><td>38</td><td>299</td></tr>
<tr><td>137</td><td>387</td></tr>
</table>

[BILL IN EQUITY AGAINST EXECUTOR AND GUARDIAN FOR ACCOUNT AND SETTLEMENT OF ESTATE.]

1. *Jurisdiction of equity over charities.*—The doctrine is settled in this State, that the chancery court has jurisdiction, by virtue of its original, common-law powers, without claiming prerogative powers, and without the aid of the statute of 43d Elizabeth, to uphold bequests to charitable uses, where an ascertainable object, recognized as charity, is designated by the testator in general or collective terms, although no trustee is appointed by him, or the trustee appointed is incapable of taking the legal interest.

2. *Bequests to charity held valid.*—An executory bequest of money to " *Pilgrims' Rest Association*," "to be loaned out by commissioners to be appointed by said association, and the interest to be equally divided annually between the ministers having charge of churches in said association:" and a similar bequest to " *Vienna and Cochran's Mill Beat*," to be received and loaned out by three commissioners elected by the people of the beats, the interest to be  collected annually, "and applied by said commissioners to the education and tuition of all the pauper and poor children of said beats whose parents are not able to support them,"—are both valid, and will be upheld in equity.

3. *Bequest to daughter "and begotten heir or heirs of her body," with executory bequest over to charity.*—Where the testator, after giving several specific legacies, by the sixth clause of his will, bequeathed "the residue" of his property, which was described as consisting of a tract of land and certain slaves, to his daughter, "and the begotten heir or heirs of her body ;" then directed "the balance" of his estate to be sold, and the proceeds of sale, after payment of his debts, to go to his daughter ; and, by the seventh clause, directed that, "if she should die without a surviving heir or heirs of her body," "all her property" should be sold, "and all her estate be equally divided into two parts," which he bequeathed to valid charities,—*held*, that the executory bequests included the *corpus* of all the property given to the daughter by the sixth clause, but did not include the rents, income, and profits of the estate, remaining undisposed of at her death, since they vested in the daughter absolutely.

APPEAL from the Chancery Court of Pickens.
Heard before the Hon. JAMES B. CLARK.

THE bill in this case was filed, on the 28th April, 1860, by Mrs. Dicey Williams, against Joel E. Pearson, as the guardian of Sally Ann Taylor, deceased, and as the executor of Zealous Taylor, deceased, for an account and settlement of the estate which went into his hands in his double capacity of executor and guardian. Zealous Taylor died in February, 1851, having executed and published his last will and testament, which was dated the 8th July, 1848, and duly admitted to probate after his death. By the first clause of his will, the testator directed his debts to be paid; the second, third, fourth, and fifth clauses gave several specific legacies; and the sixth and seventh clauses, the construction and effect of which involve the material questions of the case, were in the following words:

"*Item sixth.* And the residue of my property, both real and personal, I will and bequeath to my beloved daughter, Sally Ann Taylor, and the begotten heir or heirs of her body ; consisting of between six and seven hundred acres of land, adjoining the tract on which I live, besides the dower in Matthew Taylor's land, together with thirteen negroes, namely," (specifying their names,) "together with their increase. It is my will, that the balance of my estate be sold, on a credit of twelve months, and the pro-

ceeds, after paying my just debts, to go to my daughter, Sally Ann Taylor, except my two best beds, bedsteads, and furniture, and all my made bed-covers, her mother's saddle, all my trunks and books, which are to be exempt from sale, and to be well taken care of for my daughter.

"*Item seventh.* I do hereby constitute and appoint my friends and neighbors, Vincent Bunting and Joel E. Pearson, the executors of this my last will and testament; and it is my will, that they make no return of my estate until it is ready for final settlement, and that the inventory, account of sales, and the account-current of my estate, be returned at the same time (final settlement), so that all the papers may be found together; and it is my will, that my executors settle my estate as soon as the nature of the case will admit of; and, on final settlement of my estate by my executors with the court, my will is, that my friend Vincent Bunting take the guardianship of my daughter, Sally Ann Taylor, and the care of her property; and that her guardian and Joel E. Pearson, and their wives, take charge of my daughter; and my will is, that she remain at Joel E. Pearson's, and be sent to school with his daughters, and be treated as his own daughters, and for him to be paid whatever is right for her board, clothing, and medical aid; that Mrs. Pearson take one of her beds and half her bed-clothes, and Mrs. Bunting take the other half," &c. "It is my will for her to have a good education as her property will admit of; and that her guardian hire out her negroes, publicly or privately, as he may see proper, and for them not to be hired out on the west side of the river, nor in the prairies any where, as I want good care taken of them, and want them well clothed, shod, and good bed-clothes procured for them. Also, I want my lands, orchards, and grove taken good care of, as I want all the above to be beneficial to my daughter when she is in a situation to receive them. And if she should die without a surviving heir or heirs of her body, my will is, that all her property shall be sold, on a credit of one, two, and three years installments, and all her estate to be equally divided into two

parts; one half of said estate I loan to *Pilgrim's Rest Association*, to be received by said association, and loaned out by commissioners to be appointed by said association, at eight per cent. *per annum*, and said interest to be equally divided annually between the ministers having charge of churches in said association; and the other half I loan to *Vienna and Cochran's Mill Beat*; and my will is, that three commissioners be elected by a general vote of the two beats, to receive the money, by their giving good and sufficient security, in double the amount which they may receive, to the judge of the county court of Pickens county; and said commissioners to loan out said money, at eight per cent. interest, and the said interest to be collected annually, and applied by said commissioners to the education and tuition of all the pauper and poor children of said beats, whose parents are not able to support them."

Both of the executors named in the will qualified, and took on themselves the execution of the trust; but, on the 30th June, 1853, Bunting made a final settlement, resigned his office of executor, and renounced the guardianship of Sally Ann Taylor; and at the same time Pearson made a partial settlement, gave a new bond and qualified as sole executor, and also qualified as guardian of Sally Ann Taylor. In October, 1857, Sally Ann Taylor died, intestate, unmarried, and under the age of twenty-one years. On the 11th January, 1858, Pearson made a final settlement of his guardianship of her estate; and on the 24th December, 1859, letters of administration on her estate were granted to the complainant. The bill sought an account and settlement of all the defendant's acts as executor and guardian; insisted that the settlement of his guardianship was void, because no administrator of the ward's estate had been appointed; and that the bequests to charitable uses, contained in the seventh clause of the testator's will, were invalid.

The chancellor held, on demurrer, that the executory bequests were valid, and included all the property devised and bequeathed to Sally Ann Taylor, with the rents, in-

come, and profits thereof, remaining undisposed of at her death; and, consequently, that the complainant had no interest which she could assert by bill. He therefore dismissed the bill, and his decree is now assigned as error.

E. W. PECK, for the appellant.

TURNER REAVIS, contra.

R. W. WALKER, J.—It is not denied that, according to the law of charitable uses, as administered in the English court of chancery, the executory bequests contained in the seventh item of this will would be upheld. But it is insisted, that the authority of the English court of chancery, in regard to donations to charitable uses, so far as it differs from the power exercised in other cases of trust, is either derived from the statute of 43d Elizabeth, ch. 4, known as the 'statute of charitable uses,' or belongs to the chancellor as a branch of the prerogative power of the king; and that apart from the prerogative power with which the chancellor is clothed, and independently of the statute of Elizabeth, the jurisdiction of the court of chancery, over bequests and trusts for charity, is precisely the same as over bequests and trusts for other lawful purposes, and must be exercised upon the same principles, and by the same rules. It is further insisted, that the statute of 43d Elizabeth is not in force here; and that this being so, and inasmuch as our chancery courts are not clothed with the prerogatives of the crown, and exercise no other than judicial power, it follows, that the English law of charitable uses, so far as it differs from the law governing bequests and trusts for other lawful purposes, cannot be recognized by our courts. If these propositions can be maintained, it results, that the validity of these bequests must depend upon the principles applicable to bequests and trusts in general, and not upon the peculiar doctrines which prevail in England in regard to charitable donations, as distinguished from gifts for other purposes; and consequently, if the bequests would have been void, had their purposes not

been charitable, the fact that their purposes are charitable does not make them valid.

Few questions have been the subject of more laborious investigation, or given rise to greater conflict of opinion, than that which relates to the origin of the peculiar juris-diction of equity in respect to charities. Many eminent jurists sustain the view which has been pressed upon us with so much ability by the counsel for the appellant, and trace the English law of charitable uses, so far as it differs from the law of trusts in general, either to the statute of the 43d Elizabeth, or to the prerogative power of the king, which the chancellor exercises as the personal representa-tive of the crown. Such seems to have been the opinion of Lord Loughborough.—*Attorney-General v. Bowyer*, 3 Vesey, Jr. 714, 726. Chief-Justice Marshall held substantially the same doctrine, in the case of the *Baptist Association v. Hart's Ex'rs*, 4 Wheat. 1. So, likewise, has Chief-Justice Taney, in the case of *Fontain v. Ravenel*, 17 How. (U. S.) 391, *et seq.;* and in a recent case, in an opinion marked by great ability and research, a majority of the court of ap-peals of New York came to the same conclusion, and held that, in New York, where the court of chancery is not en-dowed with any portion of the prerogative power, and where the statute of Elizabeth is not in force, the jurisdic-tion possessed by the chancery courts over charitable trusts is limited to that which is exercised by the court of chan-cery in England over trusts in general.—*Owens v. Mission-ary Society*, 4 Kernan, pp. 380, 388, 403, 405. See, also, *Gallego v. Attorney-General*, 3 Leigh, 450 ; *Literary Fund v. Dawson*, 10 Leigh, 147; *Janey v. Lalane*, 4 ib. 327; *Dashiel v. Attorney-General*, 5 H. & G.; *Green v. Allen*, 5 Hump. 170; *Moore v. Moore*, 4 Dana, 357.

On the other hand, another class of jurists maintain, that the English law of charitable uses does not derive its origin from the statute of the 43d Elizabeth, nor depend upon it; but that at a remote period in English judicial his-tory it was engrafted upon the common law, its general maxims being derived from the civil law; that the statute

of Elizabeth introduced no new principle, but was designed to afford a new and. less dilatory mode of establishing charitable donations, which were understood to be valid by the laws antecedently in force; and that, independently of the statute of Elizabeth, and apart from the royal prerogative, there is an inherent jurisdiction in equity to establish and enforce devises and grants to charities, which, but for the charitable feature, would be void.

Thus, in the case of the *Attorney-General v. Skinners' Company*, 2 Russ. Ch. 407 (420), Lord Eldon intimated, that, independent of, and antecedent to the statute of Elizabeth, there was in the court of chancery a jurisdiction "to render effective an imperfect conveyance for charitable purposes." Lord Redesdale, in a case in the house of lords, declared, that the statute of Elizabeth "only created a new jurisdiction—it created no new law."—*Attorney-General v. Mayor, &c.*, 1 Bligh, N. S., 312, 347-8. And Lord-Chancellor Sugden, after a thorough review and analysis of the cases, came to the conclusion, that there was an inherent jurisdiction in chancery, existing before, at, and after the time of the statute of Elizabeth, to sustain devises to charitable uses, which were void at law.—*Incorporated Society v. Richards*, 1 Dr. & W. 258. Chancellor Kent says: "The fact, I think, may be considered indisputable, that charitable uses are lawful uses by the common law, and that the statute of Elizabeth was only an ancillary remedy, now supplied by chancery as the rightful original tribunal for such trusts."—2 Kent's Comm., note *(b)*, p. 288.

Our investigation of the cases has satisfied us, that the current of American authorities is in favor of the doctrine, that trusts for charitable uses are favored by courts of equity, and that, independent of the statute of Elizabeth, and of the prerogative power, there is an original and inherent jurisdiction in those courts to sustain, on account of their charitable purposes, trusts which, but for the charitable feature, would be held void.—*Executors of Burr v. Smith*, 7 Vermont R. 241; *Vidal v. Girard's Ex'rs*, 2 How. (U. S.) 127; *Magill v. Brown*, Brightly's R. 350; *Kursken v. Lu-*

20

*theran Churches,* 1 Sandf. Ch. 439; *Shotwell v. Mott,* 2 Sandf.
Ch. 46; *Wright v. Trustees,* &c., 1 Hoffm. Ch. 202; *Potter
v. Chapin,* 6 Paige, 639; *Dutch Church v. Mott,* 7 Paige,
79–80; *Orphans' Asylum v. McCartee,* 9 Cowen, 437, 470,
476–7; *Williams v. Williams,* 4 Selden, 525; *Whitman v.
Lex,* 17 S. & R. 88; *Mayor v. Elliott,* 3 Rawle, 170; *Zim-
merman v. Anders,* 6 W. & S. 218; *McCord v. Ochiltree,*
8 Blackf. 21; *Dixon v. Montgomery,* 1 Swan, 348, 366;
*Attorney-General v. Jolly,* 1 Rich. Eq. 99; *Gibson v. McCall,*
1 Rich. L. 174; *Beall v. Ex'r of Fox,* 4 Geo. 404, 427;
*Going v. Emery,* 16 Pick. 107; *Urmey's Ex'rs v. Wooden,*
1 Ohio St. R. 160.

In *Carter v. Balfour,* (9 Ala. 814,) this court, after a
careful examination of the subject, gave its sanction to the
doctrine just stated. In that case, the bequests, which
were to certain unincorporated charitable societies, were
plainly void, upon the principles applicable to ordinary
bequests and trusts.—Appendix, 3 Peters, 488; *Williams
v. Williams,* 4 Selden, 540; *McCord v. Ochiltree,* 8 Blackf.
16; *State v. Gerard,* 2 Ired. Eq. 218; Hill on Trustees,
131. But it was held, that, being charitable bequests, a
court of equity could give them effect by virtue of its com-
mon-law and judicial powers, without claim to any *pre-
rogative* power, and without invoking the aid of the sta-
tute of 43d Elizabeth. A decision, thus deliberately made,
upon a question involved in so much doubt and obscurity,
and upon which so much may be said on both sides, we
are not disposed to disturb. Without intimating, there-
fore, what our opinion would be if uncontrolled by any
former adjudication, we content ourselves with saying, that
it must be regarded as the settled law of this State, that
charitable donations are so far exempted from the rules ap-
plicable to other trusts, that it is not necessary to their
validity that there should be a grantee or devisee capable
of taking or holding by law, or that there should be a
*cestui que trust* so definitely described as to enable a court
of equity to execute the trust upon its ordinary principles.
Such we understand to be the doctrine to be deduced from

the case of *Carter v. Balfour, supra*, and the other authorities above cited.

It will be perceived, that we do not recognize the whole of the English doctrine of charities as in force here. A considerable portion of it is not adapted to our political condition, and has been rejected by our courts. In England, whenever anything is given to charity, and no charity appointed,—that is to say, where the testator declares his intention in favor of charity indefinitely, without any specification of objects; or where the charity which is appointed is superstitious, the power of appointment vests in the king as *pater patriæ*, and is exercised by him through the chancellor.—Willard's Eq. Jur. 580. So, likewise, when a definite object of charity is specified, which fails, or becomes impracticable, so that the fund cannot be applied to the charity intended by the testator, the court will, under the doctrine of *cypres*, apply it to some kindred or analogous object of charity. The power exercised by the English court of chancery, in the two classes of cases just mentioned, is not judicial power, and does not belong to our courts.—*Carter v. Balfour*, 19 Ala. 814; *Moore v. Moore*, 4 Dana, 366–7; *Williams v. Williams*, 4 Selden, 548; Hill on Trustees, m. p. 128, *note*. But, the *cypres* doctrine and the prerogative power to carry out indefinite charities being excepted, the law of charities, as administered in the English court of chancery, is substantially our law.

Accordingly, when an ascertainable object, recognized as charity, is designated by the donor, in general or collective terms,—as the poor of a given county or parish, or the clergymen of a particular denomination having charge of churches within a specified district, the gift or legacy will be upheld by a court of equity. Nor is it any objection to the validity of such a gift, that the donor has appointed no trustee, or that the trustee appointed is incapable of taking the legal interest. If the object of a charitable donation can be ascertained, the want of a trustee will be supplied by appointment by a court of equity.— *Washburn*

*v. Sewell,* 9 Metc. 280 ; *Winslow v. Cumming,* 3 Cushing, 365 ; *Moore v. Moore,* 4 Dana, 358–9 ; *Attorney General v. Jolly,* 1 Rich. Eq. 109 ; 2 Story's Eq. §§ 976, 1059 ; Willard's Eq. 424, 580.

In both of the bequests under consideration, the objects of the testator's bounty are so designated that they may be readily found. ·It is plainly to be inferred from the language used, that *" Pilgrim's Rest Association"* is a society which extends over a particular section of country ; and the fund is "to be equally divided annually between the ministers having charge of churches in said association ". In the other bequest, the beneficiaries named are "all the pauper and poor children" of two designated *beats,* "whose parents are not able to support them". When this will was executed, a *beat* in this State was a well-known legal subdivision of a county, corresponding to the townships or towns in some other States. It is clear, upon the principles above laid down, and also according to the adjudged cases, that, in both instances, the testator's designation of the objects of his bounty is sufficiently specific, and that the bequests are valid.—*Whitman v. Lex,* 17 S. & R. 88 ; *Pickering v. Shotwell,* 10 Barr, 23 ; *Zimmerman v. Anders,* 6 W. & S. 208 ; *State v. Gerard,* 2 Ired. Eq. 210 ; *McCord v. Ochiltree,* 8 Blackf. 15 ; *Shotwell v. Mott,* 2 Sandf. Ch. 46 ; *Williams v. Williams,* 4 Selden ; *Dickson v. Montgomery,* 1 Swan, 348 ; *Urmey v. Wooden,* 1 Ohio St. R. 160 ; *Attorney-General v. Clark,* 1 Ambler, 422 ; *West v. Shuttleworth,* 2 M. & K. 684 ; *Attorney-General v. Gladstone,* 13 Sim. 7 ; *Attorney-General v. Comber,* 2 Sim. & Stu. 93.

Whether they could have been sustained upon the general doctrine of trusts, had the objects not been charitable, is a question we need not consider. See, however, authorities cited *supra* as to the invalidity of the bequests in *Carter v. Balfour,* considered apart from the rules peculiar to charities.

[3.] These bequests being ascertained to be valid, the next question is, what do they include. And here we concur with the chancellor, in holding that they embrace all the

property which, by the 6th item of the will, is given to the daughter—not only the land and negroes, but that which the testator designates as "the balance of his estate", and directs to be sold, the proceeds, after the payment of his debts, to go to his daughter. But the chancellor held, that these charitable bequests embraced not only the *corpus* of the property devised to the daughter, but also all the rents, profits, and income thereof, left undisposed of by her at her death. In this we think there was error. The estate which the daughter took under the 6th item of the will, was a fee, determinable on her dying without a surviving heir or heirs of her body.—*Uhrystee v. Phyfe*, 19 N. Y. 345 (357–9). In any event, therefore, her estate would endure for her life, and she had at least all the rights of a tenant for life. Hence, she was entitled to the rents, income, and profits of the estate, in absolute right, with full power to use and dispose of them as she might see fit.—2 Bla. Com., m. p. 122; 4 Kent, 73.

As the daughter had the absolute right to the rents, income, and profits, and could use and dispose of them to any extent she might desire, without liability to account therefor, there could be no limitation over of them by way of executory bequest.—*Allen v. White*, 16 Ala. 186; *Flinn v. Davis*, 18 Ala. 162; *Weathers v. Patterson*, 30 Ala. 404; *McRee v. Means*, 34 Ala. 368. If, therefore, we can suppose that it was the intention of the testator to include in the executory bequests the rents, income, and profits of his daughter's estate, remaining undisposed of at her death, these bequests over must, to that extent, be held void, and the rents and profits left undisposed of by the daughter belong to her estate, and go to her personal representative.

Decree reversed, and cause remanded.

STONE, J., not sitting.